IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRANK THOMPSON,

             Petitioner,                   No. 2:07-cv-2577-WBS-JFM (HC)

     vs.

D.K. SISTO,

             Respondent.              <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

        Petitioner is a state prisoner, proceeding pro se, with an application for writ of

habeas corpus pursuant to 28 U.S.C. § 2254.  On August 6, 1979, plaintiff was sentenced in the

San Bernardino County Superior Court to life imprisonment after having been convicted of two

counts of murder in the first degree (Cal. Penal Code § 187), two counts of robbery (Cal. Penal

Code § 211), and one count of burglary in the first degree (Cal. Penal Code § 459).  (Ans., Ex. A

at 3-4.)  On August 7, 1979, petitioner was sentenced in the San Bernardino County Superior

Court to twenty-five years to life after having been convicted of two counts of conspiracy with

overt acts (Cal. Penal Code § 182), one count of attempted murder while using a firearm (Cal.

Penal Code §§ 187, 664, 12022.5), and one count of attempted escape while using a firearm (Cal.

Penal Code §§ 4532b, 12022.5).  (Ans., Ex. A at 1-2.)  In 1987, the Fourth Appellate District of

California held that because petitioner committed his crimes before the age of eighteen, he could

1

1  not be held in prison for life without the possibility of parole and converted his sentence to

2  twenty-five years to life with the possibility of parole.  (P&A, Ex. H.)

3          In the petition now pending before this court, petitioner challenges the October

4  26, 2005 decision of the California Board of Parole Hearings (hereinafter, the "Board") that he is

5  unsuitable for parole.  (P. & A. in Supp. of Pet., hereinafter "P&A," at 2.)  Upon consideration of

6  the record and the applicable law, the undersigned recommends that petitioner's application for

7  habeas corpus relief be granted.

8                              PROCEDURAL BACKGROUND

9          On October 26, 2005, petitioner appeared before the Board for a parole

10  consideration hearing and was found unsuitable for parole.  (P&A, Ex. B.)

11          On December 28, 2006, petitioner challenged the Board's 2005 decision through

12  a habeas petition filed in San Bernardino County Superior Court.  (P&A, Ex. L.)  The Superior

13  Court issued a reasoned opinion affirming the Board's decision and denying the petition on

14  March 19, 2007.  (Id.)

15          Petitioner filed an application for writ of habeas corpus to the California Court of

16  Appeal for the Fourth Appellate District which was summarily denied on June 6, 2007.  (P&A,

17  Ex. M.)

18          Petitioner filed an application for writ of habeas corpus to the California Supreme

19  Court, which was summarily denied on August 15, 2007.  (P&A at 2.)

20                                      ANALYSIS

21  I.      Standards of Review Applicable to Habeas Corpus Claims

22          Federal habeas corpus relief is not available for any claim decided on the merits

23  in

24  state court proceedings unless the state court's adjudication of the claim:

25          (1) resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established Federal law, as
26          determined by the Supreme Court of the United States; or

2

/////

> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")  The court looks to the last reasoned state court decision as the basis for the state court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).

II.   Petitioner's Claim

Petitioner alleges that the Board's October 26, 2005 denial of parole violated his right to due process under the United States Constitution.  (P&A at 13-27.)

A.   Due Process in the California Parole Context

The Due Process Clause of the Fourteenth Amendment prohibits state action that

1   deprives a person of life, liberty, or property without due process of law.  One alleging a due

2   process violation must first demonstrate that he was deprived of a liberty or property interest

3   protected by the Due Process Clause and then show that the procedures attendant upon the

4   deprivation were not constitutionally sufficient.  Ky. Dep't of Corr. v. Thompson, 490 U.S. 454,

5   459-60 (1989); McQuillion v. Duncan, 306 F.3d 895, 900 (9th Cir. 2002).

6          A protected liberty interest may arise from either the Due Process Clause of the

7   United States Constitution or state laws.  Bd. of Pardons v. Allen, 482 U.S. 369, 373 (1987).

8   The United States Constitution does not, of its own force, create a protected liberty interest in a

9   parole date, even one that has been set.  Jago v. Van Curen, 454 U.S. 14, 17-21 (1981).

10  However, "a state's statutory scheme, if it uses mandatory language, 'creates a presumption that

11  parole release will be granted' when or unless certain designated findings are made, and thereby

12  gives rise to a constitutional liberty interest."  McQuillion, 306 F.3d at 901 (quoting Greenholtz

13  v. Inmates of Neb. Penal, 442 U.S. 1, 12 (1979)).

14         California's parole scheme gives rise to a cognizable liberty interest in release on

15  parole, even for prisoners who have not already been granted a parole date.  Sass v. Cal. Bd. of

16  Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006); Biggs v. Terhune, 334 F.3d 910, 914 (9th

17  Cir. 2003); McQuillion, 306 F.3d at 903; see also In re Lawrence, 44  Cal. 4th 1181, 1204, 1210,

18  1221 (2008).  Accordingly, this court must examine whether California provided the

19  constitutionally-required procedural safeguards when depriving petitioner of a protected liberty

20  interest and, if not, whether the Alameda County Superior Court's conclusion that it did was

21  contrary to or an unreasonable application of clearly established federal law as determined by the

22  Supreme Court.

23         It is clearly established federal law that a parole board's decision deprives a

24  prisoner of due process with respect to his constitutionally protected liberty interest in a parole

25  release date if the Board's decision is not supported by "some evidence in the record."

26  Superintendent v. Hill, 472 U.S. 445, 457 (1985); Irons v. Carey, 505 F.3d 846, 851 (9th Cir.

4

1  2007); <u>Sass</u>, 461 F.3d at 1128; <u>Biggs</u>, 334 F.3d at 915.  "The 'some evidence' standard is

2  minimally stringent," and a decision will be upheld if there is any evidence in the record that

3  could support the conclusion reached by the factfinder.  <u>Powell v. Gomez</u>, 33 F.3d 39, 40 (9th

4  Cir. 1994) (citing <u>Cato v. Rushen</u>, 824 F.2d 703, 705 (9th Cir. 1987)).  <u>See also</u> <u>Toussaint v.</u>

5  <u>McCarthy</u>, 801 F.2d 1080, 1105 (9th Cir. 1986).  However, "the evidence underlying the board's

6  decision must have some indicia of reliability."  <u>Jancsek v. Or. Bd. of Parole</u>, 833 F.2d 1389,

7  1390 (9th Cir. 1987).  <u>See</u> <u>also</u> <u>Perveler v. Estelle</u>, 974 F.2d 1132, 1134 (9th Cir. 1992).

8  Determining whether the "some evidence" standard is satisfied does not require examination of

9  the entire record, independent assessment of the credibility of witnesses, or the weighing of

10  evidence.  <u>Toussaint</u>, 801 F.2d at 1105.  The question is whether there is any reliable evidence in

11  the record that could support the conclusion reached.  <u>Id</u>.

12         When assessing whether a state parole board's suitability decision was supported

13  by "some evidence," the analysis "is framed by the statutes and regulations governing parole

14  suitability determinations in the relevant state."  <u>Irons</u>, 505 F.3d at 851.  Therefore, this court

15  must:

16             look to California law to determine the findings that are necessary
               to deem a prisoner unsuitable for parole, and then must review the
17             record in order to determine whether the state court decision
               holding that these findings were supported by "some evidence" in
18             [petitioner's] case constituted an unreasonable application of the
               "some evidence" principle articulated in <u>Hill</u>.

19  <u>Id</u>.

20         Under California law, prisoners serving indeterminate prison sentences "may

21  serve up to life in prison, but they become eligible for parole consideration after serving

22  minimum terms of confinement."  <u>In re Dannenberg</u>, 34 Cal. 4th 1061, 1078 (2005).  The Board

23  normally sets a parole release date one year prior to the inmate's minimum eligible parole

24  release date, and does so "in a manner that will provide uniform terms for offenses of similar

25  gravity and magnitude in respect to their threat to the public."  <u>In re Lawrence</u>, 44 Cal. 4th at

26  1202 (citing Cal. Penal Code § 3041(a)).  A release date must be set "unless [the Board]

determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration . . . and that a parole date, therefore, cannot be fixed . . . ."  Cal. Penal Code § 3041(b).

In order to carry out the mandate of section 3041, the Board must determine "whether the inmate poses 'an unreasonable risk of danger to society if released from prison,' and thus whether he or she is suitable for parole."  In re Lawrence, 44 Cal. 4th at 1202 (citing Cal. Code Regs., tit. 15, § 2281(a)).  In doing so, the Board must consider all relevant, reliable information available regarding

> the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release.

Cal. Code Regs., tit. 15, § 2281(b).

The regulation identifies circumstances that tend to show suitability or unsuitability for release.  Cal. Code Regs., tit. 15, § 2281(c) & (d).  The following circumstances tend to show that a prisoner is suitable for release: (1) the prisoner has no juvenile record of assaulting others or committing crimes with a potential of personal harm to victims; (2) the prisoner has experienced reasonably stable relationships with others; (3) the prisoner has performed acts that tend to indicate the presence of remorse or has given indications that he understands the nature and magnitude of his offense; (4) the prisoner committed his crime as the result of significant stress in his life; (5) the prisoner's criminal behavior resulted from having been victimized by battered women syndrome; (6) the prisoner lacks a significant history of violent crime; (7) the prisoner's present age reduces the probability of recidivism; (8) the prisoner has made realistic plans for release or has developed marketable skills that can be put to

1   use upon release; and (9) institutional activities indicate an enhanced ability to function within

2   the law upon release.  Cal. Code Regs., tit. 15, § 2281(d).

3           The following circumstances tend to indicate unsuitability for release:  (1) the

4   prisoner committed the offense in an especially heinous, atrocious, or cruel manner; (2) the

5   prisoner had a previous record of violence; (3) the prisoner has an unstable social history; (4) the

6   prisoner's crime was a sadistic sexual offense; (5) the prisoner had a lengthy history of severe

7   mental problems related to the offense; and (6) the prisoner has engaged in serious misconduct in

8   prison.  Cal. Code Regs., tit. 15, § 2281(c).  Factors to consider in deciding whether the

9   prisoner's offense was committed in an especially heinous, atrocious, or cruel manner include:

10  (A) multiple victims were attacked, injured, or killed in the same or separate incidents; (B) the

11  offense was carried out in a dispassionate and calculated manner, such as an execution-style

12  murder; (C) the victim was abused, defiled or mutilated during or after the offense; (D) the

13  offense was carried out in a manner that demonstrated an exceptionally callous disregard for

14  human suffering; and (E) the motive for the crime is inexplicable or very trivial in relation to the

15  offense.  Cal. Code Regs., tit. 15, § 2281(c)(1)(A) - (E).

16          In California, the overriding concern in determining parole suitability is public

17  safety and the focus is on the inmate's current dangerousness.  In re Dannenberg, 34 Cal. 4th at

18  1086; In re Lawrence, 44 Cal. 4th at 1205.  The California Supreme Court recently stated:

19          [T]he Penal Code and corresponding regulations establish that the
            fundamental consideration in parole decisions is public safety
20          [and] the core determination of "public safety" . . . involves an
            assessment of an inmate's *current* dangerousness. . . . [A] parole
21          release decision authorizes the Board (and the Governor) to
            identify and weigh only the factors relevant to predicting "whether
22          the inmate will be able to live in society without committing
            additional antisocial acts."  These factors are designed to guide an
23          assessment of the inmate's threat to society, *if released*, and hence
            could not logically relate to anything but the threat *currently* posed
24          by the inmate.

25  In re Lawrence, 44 Cal. 4th at 1205-06 (internal citations omitted)(emphasis in original).

26          Accordingly, when California courts review a decision by the Board to deny

                                                7

parole to an inmate, "the relevant inquiry is whether some evidence supports the decision of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." Id. at 1212 (citing In re Rosenkrantz, 29 Cal. 4th at 658; In re Dannenberg, 34 Cal. 4th at 1071; In re Lee, 143 Cal. App. 4th 1400, 1408 (2006)).

In recent years the Ninth Circuit Court of Appeals has concluded that, given the liberty interest that California prisoners have in release on parole, a continued reliance upon an unchanging factor to support a finding of unsuitability for parole may, over time, constitute a violation of due process.  The court has addressed the issue in three significant cases, each of which will be discussed below.

First, in Biggs, the Ninth Circuit Court of Appeals recognized that a continued reliance on an unchanging factor to deny parole, such as the circumstances of the offense, could at some point result in a due process violation.[1]  While the court in Biggs rejected several of the reasons given by the Board for finding the petitioner in that case unsuitable for parole, it upheld three:  (1) petitioner's commitment offense involved the murder of a witness; (2) the murder was carried out in a manner exhibiting a callous disregard for the life and suffering of another; and (3) petitioner could benefit from therapy.  Biggs, 334 F.3d at 913.  However, the court in Biggs cautioned that continued reliance solely upon the gravity of the offense of conviction and petitioner's conduct prior to committing that offense in denying parole could, at some point, violate due process.  In this regard, the court observed:

> As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law.  Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct

---

[1] That holding has been acknowledged as representing the law of the circuit.  Irons, 505 F.3d at 853; Sass, 461 F.3d at 1129.

1    would raise serious questions involving his liberty interest in
     parole.

2    <u>Id</u>. at 916.  The court in <u>Biggs</u> also stated that "[a] continued reliance in the future on an

3

4    unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs

5    contrary to the rehabilitative goals espoused by the prison system and could result in a due

6    process violation."  <u>Biggs</u>, 334 F.3d at 917.

7            In <u>Sass</u>, the Board found the petitioner unsuitable for parole at his third suitability

8    hearing based on the gravity of his offenses of conviction in combination with his prior offenses.

9    461 F.3d at 1126.  Citing <u>Biggs</u>, the petitioner in <u>Sass</u> contended that reliance on these

10   unchanging factors violated due process.  The court disagreed, concluding that these factors

11   amounted to "some evidence" to support the Board's determination.  <u>Id</u>. at 1129.  The court

12   provided the following explanation for its holding:

13           While upholding an unsuitability determination based on these
             same factors, we previously acknowledged that "continued
14           reliance in the future on an unchanging factor, the circumstance of
             the offense and conduct prior to imprisonment, runs contrary to the
15           rehabilitative goals espoused by the prison system and *could* result
             in a due process violation."  <u>Biggs</u>, 334 F.3d at 917 (emphasis
16           added).  Under AEDPA it is not our function to speculate about
             how future parole hearings could proceed.  <u>Cf</u>. <u>id</u>.  The evidence of
17           Sass' prior offenses and the gravity of his convicted offenses
             constitute some evidence to support the Board's decision.
18           Consequently, the state court decisions upholding the denials were
             neither contrary to, nor did they involve an unreasonable
19           application of, clearly established Federal law as determined by the
             Supreme Court of the United States.  28 U.S.C. § 2254(d).

20
21   <u>Id</u>. at 1129.

22           In <u>Irons</u>, the Ninth Circuit sought to harmonize the holdings in <u>Biggs</u> and <u>Sass</u>,

23   stating as follows:

24           Because the murder Sass committed was less callous and cruel
             than the one committed by Irons, and because Sass was likewise
25           denied parole in spite of exemplary conduct in prison and evidence
             of rehabilitation, our decision in <u>Sass</u> precludes us from accepting
26           Irons' due process argument or otherwise affirming the district
             court's grant of relief.

                                            9

We note that in all the cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence. Specifically, in Biggs, Sass, and here, the petitioners had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board. Biggs, 334 F.3d at 912; Sass, 461 F.3d at 1125. All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms.

Furthermore, we note that in Sass and in the case before us there was substantial evidence in the record demonstrating rehabilitation. In both cases, the California Board of Prison Terms appeared to give little or no weight to this evidence in reaching its conclusion that Sass and Irons presently constituted a danger to society and thus were unsuitable for parole. We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes. Biggs, 334 F.3d at 917.

Irons, 505 F.3d at 853-54.[2]

B.    Petitioner's State Proceedings

On October 26, 2005, the Board found petitioner unsuitable for parole and concluded that he "would continue to pose an unreasonable risk of danger to society or a threat to public safety if released from prison." (Ans., Ex. B at 90.) The Board stated that its conclusion was based on the following circumstances: (1) petitioner's prior criminal record and

---

[2] The California Supreme Court has also acknowledged that the aggravated nature of the commitment offense, over time, may fail to provide some evidence that the inmate remains a current threat to public safety. In re Lawrence, 44 Cal. 4th at 1218-20 & n.20. Additionally, a recent panel of the Ninth Circuit in Hayward v. Marshall, 512 F.3d 536, 546-47 (9th Cir. 2008), determined that under the "unusual circumstances" of that case the unchanging factor of the gravity of the petitioner's commitment offense did not constitute "some evidence" supporting the governor's decision to reverse a parole grant on the basis that the petitioner would pose a continuing danger to society. However, on May 16, 2008, the Court of Appeals decided to rehear that case en banc. Hayward v. Marshall, 527 F.3d 797 (9th Cir. 2008). Therefore, the panel decision in Hayward is no longer citable precedent.

his failure "to profit from society's previous attempts to correct your criminality"; (2) the commitment offenses, which were found to be "extremely aggravated" and were "carried out in [an] especially cruel and callous manner" on three individuals – two who were killed and one who was attacked; (3) petitioner's "well-documented history of unstable relationships"; (4) twenty-one disciplinary reports from the time of petitioner's entry into prison until April 1992; and (5) opposition to parole by the District Attorney and the Sheriff's Office.  (Id. at 90-94.)

The Board noted the following circumstances for the record as favorable to petitioner: (1) positive parole plans; (2) favorable psychiatric and psychological reports; and (3) a "loving wife and family."  (Ans., Ex. B at 93-94.)

On March 19, 2007, the Board's decision was reviewed by the San Bernardino County Superior Court pursuant to a state petition for habeas corpus.  (P&A, Ex. L.)  That court upheld the Board's decision, stating:

> The Petitioner contends that his potential for violence has diminished since 1988 and the psychiatric and psychological reports indicate that there has been a change in that his danger to the public outside of prison has "much decreased."  A review of the record indicates that he had a history of unstable relationships and the District Attorney and Sheriff opposed his being granted a finding of suitability.
>
> The Petitioner contends that the Board erred in denying him parole on the basis of the past unchanging facts of the crime and because of the fact that he was a juvenile when the crime was committed the Board had erred in finding him a "worst" offender.  He further contends that the Board erred in relying on the offense to find that there is a current risk to society and a danger to public if he is released from prison.  He contends that there is no evidence in the record that he is a current risk to anyone.
>
> A review of the record indicates that the Petitioner was originally sentenced to life without parole but his sentence was changed to twenty-five years to life after a holding by the Court of Appeal that as a juvenile he could not be sentenced to life without the possibility of parole.  Apparently the Petitioner is now forty-five years of age and has remained disciplinary free for the past thirteen years.
>
> A review of the file indicates that on November 1, 1978 two individuals by the name of Earl Gregory and Charles Beggs were employees at a market in Helendale, California.   Their bodies were discovered with Mr. Beggs having had his throat cut and Mr. Gregory dying of multiple injuries.  The investigators determined that the motive for the killings

11

appeared to be robbery.  A blood trail led from the scene of the killings to the residence of the Petitioner where he and his fifteen year old brother resided.  The Petitioner, his brother and a Martin Johnson were all arrested for the crime.

Apparently on April 2, 1979 after the Petitioner was in custody he was involved in an attempted escape during a time that he was being transported with other prisoners in a sheriff's van on the way to court. The Petitioner was successful in taking the gun of a deputy sheriff who was driving the van.  The Petitioner tried to shoot the deputy but the deputy was successful in preventing his being shot by placing his finger in the trigger of the gun so that it could not be pulled.  The Petitioner also had a juvenile record for possession of marijuana and had been placed on probation for a period of two years.  The Petitioner had at least one other offense as a juvenile but it is not entirely clear the nature of that offense.

The Board discussed the Petitioner's family history which involved an abusive alcoholic father and a step mother who was engaged in prostitution.  The Petitioner had no employment or military history as he was arrested at the age of seventeen.  He now has strong family ties with a wife he married while in prison and a daughter who is attending high school at a location in California.  The Petitioner has some job offers but there is no final or fixed post parole plans.

The Board reviewed the letters received in support of the Petitioner from a sister-in-law and from Petitioner's daughter as well as others.  The Board also reviewed and considered the counselor's report.  The Board found that the Petitioner has maintained a good work record.

In its decision the Board found and concluded that the Petitioner was not suitable for parole and would continue to prove a danger to society or a threat to public safety if released.  The Board engaged in the weighing process of the factors of suitability against the factors of unsuitability and found that the unsuitability factors outweighed the former.  The Board further found that the offense was extremely aggravated and carried out in an especially cruel and callous manner with multiple victims and without an obvious motive except robbery.  The Board further considered the fact that the Petitioner had been involved in the offense of conspiracy to escape and attempted murder of the police officer.

The Board recognized and commended the Petitioner for doing a turn around but felt that additionally [*sic*] time was needed because of the enormity of the crime and his institutional behavior.  The Board denied parole for an additional three year period.  The board recognized that Petitioner is working on his problems but commented that he had dug himself a "very deep hole" from which he was going to have to work very hard to extricate himself.

The last and most definite word on the area of law controlling judicial review of Board of Parole Hearing decisions denying a finding of suitability for parole was made by the California Supreme Court in In re Rosenkrantz 29 Cal. 4th 616 and in In re Dannenberg (1/24/05) 34 Cal.

4th 1061[. A]lthough the higher court in Rosenkrantz, <u>Supra</u> was ruling on the Governors actions, the rules of law controlling review also applied to judicial review of the Board of Parole Hearings decisions.  This is evident by the court referring continually to the rules, which govern the Board as being the rules that control judicial review of the Governors decision.

Penal Code § 3041(b) provides for parole review of inmates such as Petitioner and further provides that such inmates shall be given a release date <u>unless</u> the Board determines that the gravity of the current convicted offense is such that consideration of the public safety requires a more lengthy period of incarceration.  California Code of Regulations, Title 15, § 2402(a)(b)(c)(d) sets forth the rules by which the Board is to make its determination.  As stated by the court in <u>In re Dannenberg</u>, <u>Supra</u>, parole applications have an expectation of being granted parole unless the Board finds <u>in the exercise of its discretion</u> that the applicant is unsuitable.

The operative words are "in the exercise of its discretion".  Judicial review of this discretion is limited only to a determination of whether there is "some evidence" in the record to support the decision.  As held by the Court, this standard of "some evidence" is extremely deferential.

While not a "potted plant" the reviewing Court is prohibited from conducting an independent assessment of merits or considering whether substantial evidence supports the findings of the board and its underlying decision.  The Board is required to consider the Petitioner's background, his institutional participation, post-parole plans, as well as the psychological evaluations.  The High Court held, however, that the nature of the inmate's offense, <u>alone</u>, could constitute a sufficient basis for denying parole.  This does not permit the paroling authority to automatically exclude parole for individuals who have been convicted of a particular type of offense.

A review of the record supports a finding that there was "some evidence" which led the Board to its finding of unsuitability of the Petitioner for parole, for as the High Court described such evidence, it need be only a "modicum" of evidence.

The Board did consider the positive factors, which favored parole and made its finding that these did not outweigh the factors surrounding the circumstances of the crime.  While the decision did not reflect the weighing process of the Board, the <u>Rosenkrantz</u> Court, at page 677, clearly states that the Board need not explain its decision or the precise manner in which the facts were relevant to parole suitability.  This consideration and balancing lie within the discretion of the Board.

It is plain and the Board stated in its decision that the primary basis for the finding of the Petitioner being unsuitable for parole and that he would impose an unreasonable risk or threat to society was the circumstances of the committed offense and further the present committed offense was done while in prisoner serving time for a serious felony.  Further, the Board

considered the history of the Petitioner of assaultive behavior and an escalating pattern of criminal conduct including his violent attempts to escape incarceration. The Board found that the Petitioner had not benefited from the previous attempts of society to correct his criminality.

The Board did consider the positive factors which favored parole and made its finding that these factors did not outweigh those surrounding the circumstances of the crime and the other considerations which the Board had made. While the decision did reflect the weighing process of the Board the Rosenkrantz court, at page 677 clearly states that the board need not explain its decision or the precise manner in which the facts were relevant to parole suitability. This consideration and balancing lie within the discretion of the Board. It is plain and the Board stated it in its decision that the primary basis for the finding of the Petitioner being unsuitable for parole and that he would pose an unreasonable risk or threat to society was the circumstances of the committed offenses. The decision of the Board indicates that it relied upon the fact that the motive of the crime was inexplicable in relation to the nature of the circumstances of the crime.

The court feels after a review of the evidence before the Board that there was more than some evidence to support the denial of suitability for parole on the basis of the conduct of the Petitioner in the commission of the crimes. The court further finds that the denial of suitability for three years was appropriate.

(P&A, Ex. L.)

3.   Discussion

After taking into consideration the Ninth Circuit decisions in Biggs, Sass, and Irons, and for the reasons set forth below, this court concludes that petitioner is entitled to federal habeas relief with respect to his due process challenge to the Board's October 26, 2005 decision denying him parole.

The court begins its analysis by addressing the factors relied on by the Board to deny petitioner parole. The Board began the hearing by discussing petitioner's "well-documented history of unstable relationships," which it described as follows:

[Petitioner is] the oldest of three siblings born in Reno, Nevada. Parents separated at an early age. . . . His chaotic family background includes an abusive, alcoholic father, with a history of prior commitments to CDC, and a stepmother involved in prostitution. The prisoner's younger brother was, also, arrested and convicted in the commitment offense. [Petitioner] admitted to a personal history of alcohol abuse prior to and including his teenage years and extensive experimentation with

14

1  heavy drugs.  He was raised in a family who avoided moral and parental
   /////
2  /////
3  structure.  The records indicate he completed the 10th grade, however he
   did complete his GED in 1991.  He has no employment or military history
   as he was arrested at the age of 17.
4
5  (Ans., Ex. B at 17-18.)  In a psychological evaluation administered on August 22, 1988,
6  petitioner's family history was described in this manner: "As a young child, [petitioner] had
7  lived alternately with his ex-felon father and with his mother and an abusive stepfather who
8  would beat him while his mother watched. . . . Around the age of nine, he became his alcoholic
9  father's drinking buddy, and by puberty he was almost completely out of control."  (P&A, Ex.
   G.)
10
11      In 1978, petitioner was arrested in Idaho for possession of marijuana, for which
12 he was placed on two years' probation.  (See P&A, Ex. B; Ans., Ex. B at 16.)  He deserted
13 probation and came to California without his parole officer's permission.  (P&A, Ex. B.)  Upon
14 his return to California, petitioner, who was seventeen at the time, committed the crimes for
15 which he is presently incarcerated.  It is with respect to petitioner's commission of the crimes
16 while on parole that the Board stated petitioner failed "to profit from society's previous attempts
   to correct [his] criminality."  (Ans., Ex. B at 92.)
17
18      The Board then read into the record a description of the crimes:
19      On November 1, 1978, the bodies of Earl Gregory and Charles
        Beggs . . . were discovered by an employee at the Mohave Gables
20      (phonetic) Market in Helendale, California.  Deputies entered the store
        through a rear door and proceeded to the cash register.  At that time,
21      Deputy Holkham . . . observed victim Charles Beggs lying on the floor.
        He was face up and a large amount of blood was around his throat and
22      head area.  Officers began to check the rest of the building and noted
        bloody foot tracks.  At a nearby walk-in type refrigerator, victim Gregory
23      was found on the floor.  Homicide detectives later determined that Charles
        Beggs died of a three or four-inch incision through his neck to the jugular
24      vein and (indiscernable) artery.  Earl Gregory died of multiple injuries.
        They were primarily blood injuries, causing bruises, lacerations, and other
25      types of trauma.  It appears that an instrument, other than the hands, was
        used to cause these injuries.  The motive for the murders appeared to be
26      robbery, as Gregory was known to keep a large amount of cash in his
        market for the purpose of cashing customer's checks.  It was later

15

determined that cash was taken from the register and a collection of gold coins removed from the premises.  During the investigation, deputies found footprints leading from the rear of the store.  Tracks were followed to the residence of the prisoner and his 15-year-old minor brother. . . .

On April 2, 1979, Thompson was (indiscernable) fifteen individuals traveling on a van for court appearances.  (Indiscernable) Victor Balibarstow (phonetic) following information as a result of energies of most of the inmates on the van.  While the Deputy Sheriff was putting gas into the van, inmate Johnson told Thompson that, if he got a chance, that he should kick the Deputy's head through the windshield, get his gun, and kill him, and let everyone out of the van.  The Sheriff stated he was traveling north of Victorville (phonetic), when Thompson, who was handcuffed and in a waist chain, charged him.  (Indiscernable) the Deputy and tried to fall on top of him.  Thompson was successful in getting the Deputy's revolver while the Deputy was attempting to negotiate the vehicle and fight off Thompson.  The Deputy stated that Thompson tried to shoot him with the gun, but the Deputy was successful in placing his finger behind the trigger and in front of the trigger guard, which prevented the discharge of the weapon.  He stated he could feel the attempts of Thompson to pull the trigger.  After they wrestled for approximately five minutes, the Deputy gained control of the situation and the gun.

(Ans., Ex. B at 90-91.)  The Board described the crimes as "extremely aggravated" and stated that they were carried out in an "especially cruel and callous manner" on multiple victims who were abused and/or defiled during the course of the offenses.  (Id. at 90-91.)  The Board further stated that they "will continue to be a large part of the problem" and that petitioner was in "a very deep hole."  (Id. at 90, 93.)

Since his incarceration in 1979, petitioner received the following 115 disciplinary citations[3]: (1) September 9, 1979, for an altercation; (2) October 26, 1979, for possession of weapon; (3) June 5, 1980, for possession of alcohol; (4) June 23, 1980, for force and violence; (5) July 25, 1980, for possession of pruno; (6) February 1, 1982, for force and violence and stabbing assault; (7) September 6, 1982, for an altercation; (8) November 9, 1982, for possession of alcohol; (9) February 23, 1983, for threatening staff (spitting and threats); (10) July 21, 1983,

---

[3] A 115 violation refers to "misconduct [that] is believed to be a violation of law or is not minor in nature . . . ."  Cal. Code Regs., tit. 15, § 3312(3).

1   for possession of pruno; (11) September 18, 1983, for disobeying a direct order; (12) October 12,

2   1983, for force and violence; (13) November 9, 1983, for destruction of state property; (14)

3   December 9, 1983, for self-mutilation; (15) April 7, 1984, for force and violence (stabbing

4   assault); (16) April 20, 1985, for assault on an inmate; (17) June 29, 1985, for destruction of

5   state property; (18) May 2, 1986, for self-mutilation; (19) January 9, 1988, for possession of

6   marijuana; (20) January 9, 1988, for threatening staff; (21) February 28, 1989, for threatening

7   staff / possession / being under the influence of pruno; (22) June 12, 1992, for manufacturing

8   alcohol; and (22) April 11, 1993, for stimulants and sedatives (alcohol).  (Ans., Ex. B at 92; <u>see</u>

9   P&A, Ex. B.)

10          Finally, the Board relied upon the statements of the District Attorney of San

11   Bernardino County, as well as a letter submitted by the Sheriff's Office, both of which opposed

12   parole.

13          In light of these factors, the Board found that "in order for us to recommend to the

14   parole board, and to the Governor, and to society at large, that you are in fact what you say, we

15   need to have an extensive period of demonstration" of petitioner's rehabilitation.  (Ans., Ex. B at

16   94-95.)  Thereupon, the Board denied parole for a period of three years.  (<u>Id.</u> at 95.)

17          Upon review of the record, the court, however, finds that there has, in fact, been

18   an extensive period of demonstration of petitioner's rehabilitation.  The court does not doubt the

19   failings of petitioner's childhood, petitioner's prior criminal record, the brutality of petitioner's

20   offenses, or the extent of petitioner's disciplinary record while incarcerated.  Nonetheless, the

21   overriding concern in determining parole suitability is public safety and the focus is on the

22   inmate's current dangerousness.  <u>In re Dannenberg</u>, 34 Cal. 4th at 1086; <u>In re Lawrence</u>, 44 Cal.

23   4th at 1205.  As the Ninth Circuit discussed in <u>Biggs</u>, "[a] continued reliance . . . on an

24   unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs

25   contrary to the rehabilitative goals espoused by the prison system and could result in a due

26   process violation."  <u>Biggs</u>, 334 F.3d at 917.

1    Here, petitioner's history of unstable relationships, prior criminal record, and the

2    circumstances of his offenses are unchanging.  These facts – taken from at least twenty-six years

3    prior to his parole hearing – speak less to petitioner's current level of dangerousness than do the

4    nineteen years of petitioner's incarceration prior to his parole board hearing, which show

5    petitioner's rehabilitation.  Although petitioner's offenses were committed in a cruel and callous

6    manner and did involve multiple victims, the court does not find them to constitute "some

7    evidence" to deny petitioner parole in light of the evidence of petitioner's rehabilitation.

8    As an initial matter, petitioner has proven himself capable of stable relationships.

9    Petitioner married in 1988, and he and his wife have an adult daughter together.  (P&A at 4.)

10   Petitioner's family, who visit him on a weekly basis, have been cited numerous times in the

11   psychological evaluations as supportive and a positive influence on petitioner.  (Ans., Ex. B at

12   19; see discussion infra.)

13   In addition, petitioner's psychological evaluations also demonstrate his

14   rehabilitation in that they show progressively lower levels of potential for violence.  Petitioner

15   underwent a psychological evaluation in 1988 for the Board of Prison Terms[4].  (P&A, Ex. G.)

16   Dr. Ruth Gattozzi, Ph.D., a staff psychologist, determined that petitioner, who was twenty-six at

17   the time of the evaluation, exhibited "diminished" potential for violence and that his "inner

18   controls have improved with developing maturity, but his potential for acting-out behavior must

19   be considered somewhat unpredictable in view of his emotional fragility." (Id. at 2.)  During this

20   meeting, petitioner acknowledged his drug history, including admitting that in the three to four

21   weeks prior to murdering his two victims, he used "angel dust, LSD, and crank in Vegas plus

22   [alcohol]."  (Id.)

23   In 1991, petitioner underwent a second psychological evaluation when he was

24   twenty-nine years old.  (P&A, Ex. F.)  Dr. Asha Gandhi, a staff psychologist, found petitioner

25

26   [4] California has since replaced the Board of Prison Terms with the Board of Parole Hearings.  See Cal. Penal Code § 5075(a).

1   "to be very remorseful about the killings" and to have benefitted from individual and group

2   therapy for anger management, where his participation and attendance were described as

3   "excellent."  (<u>Id.</u> at 1.)  Dr. Gandhi found that, "[i]n a less-controlled setting, such as return to

4   the community, this inmate is considered likely to continue improvement.  This is provided he

5   refrains from poly substance abuse and maintains his relationship with his wife who appears very

6   supportive."  (<u>Id.</u>)  Dr. Gandhi further found that "[v]iolence outside a controlled setting in the

7   past was considered to be greater than average.  At present it is considered much decreased."

8   (<u>Id.</u>)

9           Petitioner underwent a third psychological evaluation in 1994 when he was thirty-

10  two years old.  (P&A, Ex. E.)  Dr. J.Y. Nakagawa found as follows: "Violence potential outside

11  a controlled setting in the past was considered to have been significantly greater than average.

12  At present it is considered to be significantly decreased.  In a less controlled setting such as

13  return to the community, Mr. Thompson is considered to likely continue improvement if he is

14  able to maintain the strong community ties and support (via his wife and children [*sic*]) and

15  abstains from use of all drugs and alcohol."  (<u>Id.</u>)  During this evaluation, petitioner stated that he

16  was taking his attitude toward alcohol seriously and was attending weekly Alcoholics

17  Anonymous ("AA") meetings.

18          Petitioner underwent a fourth psychological evaluation in 1996 when he was

19  thirty-five years old.  (P&A, Ex. D.)  Dr. Ronald H. Kitt, a clinical psychologist, found that, if

20  petitioner was to be "paroled and released, his violence potential outside a controlled setting in

21  the past is considered to have been greater than average and at present is estimated to be

22  decreased."  (<u>Id.</u>)

23          In 2001, petitioner was evaluated a fifth time for the Board of Prison Terms.

24  (P&A, Ex. C.)  He was forty years old at the time of the evaluation.  (<u>Id.</u>)  Dr. Michelle Nguyen,

25  a contract psychologist, found that petitioner "has proved himself an inmate of reasonably low

26  potential for violence within a prison setting.  If Mr. Thompson were released to the community,

19

1   it is likely he would continue in non-violent and non-confrontative directions."  (<u>Id.</u>)

2        In December 2004, petitioner received his sixth evaluation prior to his October

3   26. 2005 hearing before the Board.  (P&A, Ex. B.)  Dr. Frank Weber, a clinical psychologist,

4   found the following factors tend to increase petitioner's risk for violence: (1) the nature of

5   petitioner's crime; (2) petitioner's "lack of significant pro-social attachments, physical and

6   emotional abuse, and extremely poor parental modeling"; (3) petitioner's history of frequent fist

7   fights as an adult; (4) petitioner's multiple disciplinary violations for violent assaults on other

8   inmates (the last violation was in 1985).  (<u>Id.</u>)  As to the factors that decrease petitioner's risk for

9   violence, Dr. Weber listed the following: (1) petitioner's successful participation in work,

10   education and self-help programs while incarcerated; (2) no disciplinary infractions for fighting

11   in approximately nineteen years; (3) petitioner's "genuine" remorse and regret for the crimes he

12   committed; and (4) petitioner's "strong family bonds."  (<u>Id.</u>)  Considering these factors, Dr.

13   Weber concluded that petitioner "is in the Low to Moderate Risk category for violence should he

14   parole.  This is based mostly on historical factors."  (<u>Id.</u> at 3-4.)

15        As to petitioner's history of substance abuse, Dr. Weber noted that petitioner had

16   "attended AA/NA for many years and has participated in several addictions groups.  He presents

17   an adequate relapse prevention plan that includes focusing on his belief in God, thinking about

18   the consequences of his drinking, and reminding himself of the desire to not disappoint his

19   family. . . . It appears that he has done the work necessary to prevent his relapse when he

20   encounters situations in which alcohol is readily available.  His desire to remain sober seems to

21   be sincere."  (P&A, Ex. B at 4.)  Dr. Weber further noted that he did not see a need for additional

22   treatment.  (<u>Id.</u>)

23        Next, the court turns to petitioner's age.  The relevance of petitioner's age on his

24   level of dangerousness at the time of the parole board hearing is best understood within the

25   context of <u>Roper v. Simmons</u>, 534 U.S. 551, 569-70 (2005).  In <u>Roper</u>, the United States

26   Supreme Court addressed three substantial differences between juveniles and adults.  First, "[a]

lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions." Id. at 569 (internal quotations omitted). Second, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." Id. Lastly, "the character of a juvenile is not as well formed as that of an adult." Id. at 570.

Here, both of petitioner's commitment offenses occurred when he was seventeen years old. Since his incarceration, petitioner had multiple 115 disciplinary violations for violent behavior, all of which occurred before plaintiff was twenty-four years old. Since 1985, however, he has not had any violent 115 disciplinary violations. This is consistent with the Supreme Court's analysis of the maturity of juveniles: "The qualities that distinguish juveniles from adults do not disappear when an individual turns 18." 534 U.S. at 574. Petitioner continued with those negative proclivities that he had as a juvenile, but the evidence shows that petitioner's levels of violence and impetuousness declined with age. At the time of the parole board hearing, petitioner was forty-four years old, over twenty-seven years had lapsed since he was incarcerated, over nineteen years had lapsed since his last violent offense, and over thirteen years had lapsed since his last 115 disciplinary violation.

In addition to his stable family relationships, the multiple psychological examinations that address petitioner's low capacity for violence, a disciplinary-free record for at least thirteen years, a lack of any violent incidents for nineteen years, and successful participation in AA and NA treatment programs, all of which negate petitioner's level of dangerousness, petitioner had concrete post-parole plans, including a job as an electrician, as well opportunities with a paint company, a heat and air company, and a fitness center. (Ans., Ex. B at 20.)

The instant case is similar to In re Lawrence in that the commitment offenses and criminal history were repeatedly relied on to deny parole notwithstanding petitioner's exemplary

1  behavior and evidence of rehabilitation since the commitment offenses.  Here, petitioner's age,

2  stable family relationships, lack of any violent prison disciplinaries since 1985 and any prison

3  disciplinaries at all since 1993, commitment to sobriety, and psychologists' reports demonstrate

4  he no longer poses an unreasonable risk to public safety.  In light of the extensive evidence of

5  petitioner's in-prison rehabilitation and exemplary behavior, the reliance on the unchanging facts

6  of the commitment offenses to deny petitioner parole twenty-six years after the commitment

7  offenses, violated his right to due process.

8

9                                 CONCLUSION

10        In accordance with the above , IT IS HEREBY RECOMMENDED that:

11        1.  Petitioner's application for a writ of habeas corpus be granted; and

12        2.  Respondents be directed to release petitioner on parole forthwith.

13        These findings and recommendations are submitted to the United States District

14  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days

15  after being served with these findings and recommendations, any party may file written

16  objections with the court and serve a copy on all parties.  Such a document should be captioned

17  "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised

18  that failure to file objections within the specified time may waive the right to appeal the District

19  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

20  DATED: March 4, 2010.

21

22

23                                 UNITED STATES MAGISTRATE JUDGE

24  /014.thom2577.157

25

26

                                        22