1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

                           ----oo0oo----

11

FRANK THOMPSON,

12                                       NO. CIV. 2:07-2577 WBS JFM
           Petitioner,

13                              ORDER
      v.

14

D.K. SISTO, Warden,

15

           Respondent.

16 _____/

17

                           ----oo0oo----

18

19         Petitioner Frank Thompson filed this petition for writ

20 of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge the

21 denial of his parole in 2005.  Pursuant to § 636(b)(1)(B) and

22 Local Rule 302(c)(17), petitioner's writ was referred to a United

23 States Magistrate Judge.  On March 5, 2010, the Magistrate Judge

24 recommended that the court grant petitioner's writ and direct

25 respondents to release petitioner on parole forthwith.

26 Respondent filed timely objections, and the court now reviews the

27 Magistrate Judge's Findings and Recommendations de novo.  28

28 U.S.C. § 636(b)(1)(c); Fed. R. Civ. P. 72(b)(2)-(3).

                                1

I. <u>Factual and Procedural Background</u>

On August 6, 1979, petitioner was sentenced to life imprisonment without the possibility of parole after having been convicted of two counts of first-degree murder, two counts of robbery, and one count of burglary. (Answer Ex. A at 3-4; First Am. Pet. Ex. H.)  The following day, petitioner was sentenced to a concurrent sentence of twenty-five years to life after having been convicted of two counts of conspiracy with overt acts, one count of attempted murder while using a firearm, and one count of attempted escape while using a firearm. (Answer Ex. A at 1-2; First Am. Pet. Ex. A at 79:5-7.)  On September 10, 1987, the California Court of Appeal for the Fourth Appellate District held that petitioner's life sentence must be reduced to life imprisonment with the possibility of parole because petitioner was under the age of eighteen at the time he committed the capital offenses. (First Am. Pet. Ex. H.)  Petitioner's sentence for two counts of first-degree murder, two counts of robbery, and one count of burglary was thus reduced to life imprisonment with the possibility of parole on July 5, 1988. (Answer Ex. A at 3-4.)

Petitioner's conviction for first-degree murder, robbery, and burglary resulted from his actions on November 1, 1978 when he was seventeen years old.  Petitioner, with his fifteen-year-old brother, robbed a market in Helendale, California and murdered the two individuals working in the market by slashing one of the victim's throats and beating the other to death. (First Am. Pet. Ex. A at 91:16-24, Ex. L at 2.)  Five months later when petitioner was in custody and being transported

2

to court, petitioner obtained control of the gun belonging to the deputy sheriff who was driving the transport van and attempted to shoot the deputy and escape. (<u>Id.</u> Ex. L at 2.)  Petitioner began serving his concurrent sentences on August 16, 1979. (<u>Id.</u> Ex. I at ¶ 1.A.)

The parole board held the Parole Consideration Hearing at issue in this writ on October 26, 2005 and found that petitioner was not suitable for parole. (<u>Id.</u> Ex. A.)  Petitioner filed a writ of habeas corpus with the San Bernardino Superior Court, and the superior court denied his writ in a reasoned opinion. (<u>Id.</u> Ex. L.)  The Court of Appeal for the Fourth Appellate District summarily affirmed the Superior Court's denial of petitioner's writ. (<u>Id.</u> Ex. M.)  Having exhausted his state judicial remedies, petitioner filed the instant writ in federal court on November 28, 2007.  In his Findings and Recommendations, the Magistrate Judge concluded that, given petitioner's "in-prison rehabilitation and exemplary behavior," the parole board's "reliance on the unchanging facts of the commitment offenses to deny petitioner parole" violated his right to due process and thus recommended that the court grant petitioner's writ and direct respondents to release petitioner on parole forthwith. (Findings & Recommendations at 22:4-12.)

II.  <u>Analysis</u>

A.  <u>California's Parole Scheme</u>

"California Penal Code section 3041 vests . . . all [] California prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is

1 protected by the procedural safeguards of the Due Process

2 Clause." Irons II v. Carey, 505 F.3d 846, 850 (9th Cir. 2007).

3 Pursuant to the Antiterrorism and Effective Death Penalty Act of

4 1996, a federal court cannot grant habeas relief to a state

5 prisoner challenging the denial of his parole unless the decision

6 by the state court was "contrary to, or involved an unreasonable

7 application of, clearly established Federal law, as determined by

8 the Supreme Court of the United States" or "was based on an

9 unreasonable determination of the facts in light of the evidence

10 presented in the State court proceeding." 28 U.S.C. §

11 2254(d)(1)-(2). In determining whether the state court's

12 decision was contrary to, or an unreasonable application of,

13 clearly established federal law, a federal court looks to the

14 last reasoned state court decision addressing the merits of the

15 petitioner's claim. Robinson v. Ignacio, 360 F.3d 1044, 1055

16 (9th Cir. 2004).

17       It is clearly established by the Supreme Court "that a

18 parole board's decision deprives a prisoner of due process with

19 respect to this interest if the board's decision is not supported

20 by 'some evidence in the record,' or is 'otherwise arbitrary.'"

21 Irons II, 505 F.3d at 851 (internal citations omitted).[1]  "The

22 some evidence standard is minimally stringent, such that a

23 decision will be upheld if there is any evidence in the record

24

25       [1]    Respondent argues that application of the "some
26 evidence" standard is not clearly established in the parole
   context because the Supreme Court has not expressly applied this
27 standard to parole decisions.  The Ninth Circuit has rejected
   this position.  See, e.g., Sass v. Cal. Bd. of Prison Terms, 461
28 F.3d 1123, 1128-29 (9th Cir. 2006).

that could support the conclusion reached by the [] board."
Powell v. Gomez, 33 F.3d 39, 40 (9th Cir. 1994) (internal
quotation marks omitted).  In reviewing the denial of
petitioner's parole, the court must therefore "look to California
law to determine the findings that are necessary to deem a
prisoner unsuitable for parole, and then must review the record
in order to determine whether the state court decision holding
that these findings were supported by 'some evidence' in
[petitioner's] case constituted an unreasonable application of
the 'some evidence' principle . . . ."  Irons II, 505 F.3d at
851.

        Under California law, the parole board is required to
set a release date for an inmate serving an indeterminate
sentence who is eligible for parole unless the parole board
"concludes, on relevant grounds with support in the evidence,
that the grant of a parole date is premature for reasons of
public safety."  In re Dannenberg, 34 Cal. 4th 1061, 1071 (2005);
Cal. Penal Code § 3041(a)-(b); Cal. Code Regs. tit. 15, §
2402(a).  In determining whether an inmate is suitable for
parole, the parole board is instructed to consider

        [a]ll relevant, reliable information available[,] . . .
        includ[ing] the circumstances of the prisoner's social
        history; past and present mental state; past criminal
        history, including involvement in other criminal
        misconduct which is reliably documented; the base and
        other commitment offenses, including behavior before,
        during and after the crime; past and present attitude
        toward the crime; any conditions of treatment or control,
        including the use of special conditions under which the
        prisoner may safely be released to the community; and any
        other information which bears on the prisoner's
        suitability for release.

Cal. Code Regs. tit. 15, § 2402(b).  Overall, "the core

determination" in deciding whether an inmate is suitable for
parole "involves an assessment of an inmate's <u>current</u>
dangerousness" to the public if released, and the parole board
must "identify and weigh only the factors relevant to predicting
'whether the inmate will be able to live in society without
committing additional antisocial acts.'"   <u>In re Lawrence</u>, 44 Cal.
4th 1181, 1205-06 (2008).

 The California Code of Regulations for Parole
Consideration Criteria and Guidelines ("regulations")[2] lay out
factors for the parole board to consider that "are designed to
guide an assessment of the inmate's threat to society, if
released."   <u>Id.</u> at 1206 (emphasis omitted).   The regulations
identify circumstances tending to show unsuitability for release
as whether the prisoner 1) "committed the offense in an
especially heinous, atrocious or cruel manner," such as attacking
multiple victims, abusing the victim, carrying out the crime in a
manner that "demonstrates an exceptionally callous disregard for
human suffering," or having a trivial motive for the crime; 2)
has a previous record of violence; 3) "has a history of unstable
or tumultuous relationships with others"; 4) committed a sadistic
sexual offense; 5) "has a lengthy history of severe mental
problems related to the offense"; or 6) "has engaged in serious

---

 [2] The regulations regarding suitability for parole
discussed herein are those applicable to murders and attempted
murders that occurred on or after November 8, 1978.   Petitioner
committed murder on November 1, 1978 and attempted murder on
April 2, 1979 (First. Am. Pet. Ex. L at 2), thus would be subject
to the pre- and post-November 8, 1978 regulations.   Because the
"suitability criteria are the same" for murders or attempted
murders committed before or after November 8, 1978, the court
will simply cite to the post-November 8, 1978 regulations
regarding parole.   <u>See</u> Cal. Code Regs. tit. 15, § 2400.

1  misconduct in prison or jail."  Cal. Code Regs. tit. 15, §

2  2402(c)(1)-(6).

3          The regulations also identify circumstances that tend

4  to show suitability for release, including whether the prisoner

5  1) does not have a violent juvenile record; 2) "has experienced

6  reasonably stable relationships with others"; 3) has "performed

7  acts which tend to indicate the presence of remorse; 4)

8  "committed his crime as the result of significant stress in his

9  life, especially if the stress has built over a long period of

10 time"; 5) suffers from "Battered Woman Syndrome"; 6) "lacks any

11 significant history of violent crime"; 7) has a reduced

12 probability of recidivism based on his present age; 8) "has made

13 realistic plans for release or has developed marketable skills

14 that can be put to use upon release"; or 9) has engaged in

15 institutional activities that "indicate an enhanced ability to

16 function within the law upon release."  Id. § 2402(d)(1)-(9).

17         B.   Denial of Petitioner's Parole

18         In concluding that petitioner was not suitable for

19 parole, the parole board gave significant weight to the

20 circumstances of petitioner's commitment offense, explaining,

21         [T]hese offenses were carried out in especially cruel and
           callous manner.  Multiple victims were attacked and two
22         were killed in the same and separate incidents.  The
           victims were abused, defiled during the course of the
23         offense.  The offense was carried out in a manner which
           demonstrated an exceptionally callous disregard for human
24         suffering.  And the motive for the crime was either
           inexplicable or very trivial, depending upon which
25         circumstance you wish to look at.

26 (First Am. Pet. Ex. A at 90:24-91:9.)  The parole board further

27 reasoned that petitioner was not deterred after committing and

28 being arrested for the murders, as he later committed the

                                7

1  additional offense of attempted murder while in custody.  (<u>Id.</u>

2  Ex. A at 91:9-16.)  As circumstances suggesting petitioner's

3  unsuitability for parole, the parole board also discussed

4  petitioner's absconding from probation before committing the

5  offenses, the numerous disciplinary citations he received during

6  his incarceration, and the District Attorney and Sheriff's Office

7  opposition to petitioner's parole.  (<u>Id.</u> Ex. A at 92:14-25, 94:3-

8  7.)

9       As circumstances suggesting suitability for parole, the

10 parole board discussed how petitioner had demonstrated a "turn

11 around" in his behavior in prison, favorable information in

12 petitioner's psychological reports, petitioner's work while in

13 prison, petitioner's support network, including his wife and

14 teenage daughter, and his positive parole plans.  (<u>Id.</u> Ex. A at

15 92:26-93:3, 93:21-25, 94:11-14.)

16      In denying petitioner's writ, the Superior Court

17 identified the correct legal standards and explained that the

18 parole board "engaged in the weighing process of the factors of

19 suitability against the factors of unsuitability and found that

20 the unsuitability factors outweighed the former." (<u>Id.</u> Ex. L at

21 2.)  After identifying the various considerations the parole

22 board evaluated, the Superior Court ultimately concluded that

23 "there was more than some evidence to support the denial of

24 suitability for parole on the basis of the conduct of the

25 Petitioner in the commission of the crimes." (<u>Id.</u> Ex. L at 4.)

26      C.   <u>Consideration of *Biggs*, *Sass*, and *Irons II*</u>

27      Relying on dicta recently developed in <u>Biggs v.</u>

28 <u>Terhune</u>, 334 F.3d 910 (9th Cir. 2003), <u>Sass</u>, 461 F.3d 1123, and

8

1   <u>Irons II</u>, 505 F.3d 846, the Magistrate Judge recommended that the

2   court grant petitioner's writ.  In <u>Biggs</u>, the inmate was serving

3   a twenty-five years to life sentence and was denied parole after

4   serving fourteen years of his sentence.  <u>Biggs</u>, 334 F.3d at 912.

5   The only ground for denying parole that the Ninth Circuit found

6   the evidence supported was the "gravity of the offense" and the

7   inmate's "conduct prior to imprisonment."  <u>Id.</u> at 916.  Although

8   it upheld the denial of Biggs's writ, the court noted,

9           Over time, however, should Biggs continue to demonstrate
            exemplary  behavior  and  evidence  of  rehabilitation,
10          denying him a parole date simply because of the nature of
            Biggs' offense  and  prior  conduct  would  raise  serious
11          questions involving his liberty interest in parole. . .
            . A continued reliance in the future on an unchanging
12          factor, the circumstance of the offense and conduct prior
            to  imprisonment,  runs  contrary  to  the  rehabilitative
13          goals espoused by the prison system and could result in
            a due process violation.

14

15  <u>Id.</u> at 916-17 (internal citations omitted).

16          Three years later in <u>Sass</u>, the inmate, who had served

17  eight years of his fifteen years to life sentence, relied on this

18  language from <u>Biggs</u> to challenge the denial of his parole.  <u>Sass</u>,

19  461 F.3d at 1125-26.  Similar to Biggs, the parole board denied

20  Sass parole based solely on the "immutable behavioral evidence"

21  from "the gravity of his convicted offenses in combination with

22  his prior offenses."  <u>Id.</u> at 1129.  In holding that the "some

23  evidence" standard was satisfied, the Ninth Circuit emphasized

24  that <u>Biggs</u> suggested only that "'continued reliance in the future

25  on an unchanging factor . . . <u>could</u> result in a due process

26  violation.'"  <u>Id.</u> (citing <u>Biggs</u>, 334 F.3d at 917).

27          Less than a year later in <u>Irons II</u>, the Ninth Circuit

28  returned to the "warning set forth" in <u>Biggs</u>.  <u>Irons II</u>, 505 F.3d

1   at 850 n.1.   In <u>Irons II</u>, the inmate had served sixteen years of

2   his seventeen years to life sentence and was denied parole based

3   solely on the immutable nature of his commitment offense.   <u>Id.</u> at

4   849.   In upholding the denial of Irons's writ, the Ninth Circuit

5   noted that in <u>Biggs</u>, <u>Sass</u>, and the case before it, "the

6   petitioners had not served the minimum number of years to which

7   they had been sentenced at the time of the challenged parole

8   denial by the Board."   <u>Id.</u> at 853.   In further defining the

9   parameters of its dicta from <u>Biggs</u>, the court stated, "All we

10  held in those cases and all we hold today, therefore, is that,

11  given the particular circumstances of the offenses in these

12  cases, due process was not violated when these prisoners were

13  deemed unsuitable for parole <u>prior to the expiration of their</u>

14  <u>minimum terms</u>."   <u>Id.</u> at 853-54 (emphasis added).

15          <u>Irons II</u> thus suggests that the due process concerns

16  raised in <u>Biggs</u> are not implicated--or at least are not

17  implicated to the same extent--when inmates are deemed unsuitable

18  for parole based solely on immutable pre-incarceration

19  considerations "prior to the expiration of their minimum terms."

20  <u>Id.</u>   Here, petitioner had served twenty-six years at the time of

21  his 2005 parole hearing, thus he had served the minimum sentence

22  on his <u>second</u> sentence for conspiracy with overt acts, attempted

23  murder, and attempted escape.   His <u>first</u> sentence, however, for

24  first-degree murder, robbery, and burglary, was for life and did

25  <u>not</u> have a minimum number of years.   As <u>Irons II</u> suggests that

26  serving the minimum term of a sentence is relevant to the

27  "warning" raised in <u>Biggs</u>, it is questionable whether such

28  concerns are implicated when an inmate is serving a life sentence

10

1  without a minimum term.[3]

2         In turning to the dicta in <u>Biggs</u>, <u>Sass</u>, and <u>Irons II</u>,

3  the Magistrate Judge mistakenly concluded that petitioner was

4  serving two concurrent sentences for twenty-five years to life

5  and had thus served the minimum terms of both sentences.

6  Specifically, the Magistrate Judge recounted that, based on

7  petitioner's minority when he committed the first-degree murder,

8  robbery, and burglary, the state appellate court ordered that

9  petitioner's sentence be reduced from life without the

10  possibility of parole to twenty-five years to life with the

11  possibility of parole.  (Findings & Recommendations at 1:25-2:2.)

12  The state appellate court's decision and the resulting First

13  Amended Judgement of Commitment to State Prison, however, show

14  that petitioner's sentence for first-degree murder, robbery, and

15  burglary was reduced from life without the possibility of parole

16  to life with the possibility of parole.  (<u>See</u> First Am. Pet. Ex.

17  H ("We therefore order petitioner's sentence be reduced to life

18  imprisonment with possibility of parole, the only alternative

19  sentence authorized by the 1977 Penal Code section 190, under

20

21         [3]    The court does not mean to suggest that serving the
   minimum term of a sentence is a qualitative metamorphosis that
22  determines when an inmate can prevail under <u>Biggs</u>.  As <u>Irons II</u>
   made clear, whether an inmate is suitable for parole is a fact-
23  specific inquiry that does not turn on a fact as technical as
   having served twenty-four versus twenty-six years of a sentence
24  with a minimum term of twenty-five years.  <u>See</u> <u>id.</u> at 853-54; <u>see</u>
   <u>also</u> <u>Biggs</u>, 334 F.3d at 916-17 ("We must be ever cognizant that
25  '"[d]ue [p]rocess is not a mechanical instrument.  It is not a
   yardstick.  It is a process.  It is a delicate process of
26  adjustment inescapably involving the exercise of judgment by
   those whom the Constitution entrusted with the unfolding of the
27  process."'" (quoting <u>Lankford v. Idaho</u>, 500 U.S. 110, 121 (1991)
   (quoting <u>Joint Anti-Fascist Refugee Comm. v. McGrath</u>, 341 U.S.
28  123, 163 (1951) (Frankfurter, J., concurring)))) (alteration in
   <u>Biggs</u>).

which petitioner was sentenced."); Answer Ex. A at 3.)[4]   In light
of <u>Irons II</u>, it is therefore unlikely that petitioner's denial of
parole comes within the due process concerns raised in <u>Biggs</u>
because he is serving a life sentence without a minimum term.

       In addition to the fact that petitioner's first
sentence did not have a minimum number of years, petitioner's
situation is further distinguishable from <u>Biggs</u>, <u>Sass</u>, and <u>Irons
II</u> because the parole board's determination that petitioner was
not suitable for parole did not rest solely on the nature of his
commitment offenses or other immutable pre-incarceration
considerations.   Although the parole board emphasized that
petitioner's first offense involving the murders of the two
market employees was "extremely aggravated" and "carried out in
[an] especially cruel and callous manner" and that his second
offense "demonstrate[s] an escalating pattern of criminal
behavior," the parole board also relied on petitioner's behavior
in prison to conclude he was not suitable for parole.

       Specifically, between 1979 and 1993, petitioner
received twenty-three CDC Form 115 disciplinary citations, which

_____

       [4]     The Magistrate Judge's confusion about the duration of
petitioner's first sentence is understandable given the
inconsistencies in the record about the duration of that
sentence.   For example, the Life Prisoner Evaluation for
petitioner from November 1996 states that petitioner's sentence
is "25 years to life" for convictions for first-degree murder,
use of deadly force, robbery, and burglary (First Am. Pet. Ex. J
¶ I.A), but his Life Prisoner Evaluation for his 2005 parole
hearing described his sentence as "Original sentence was Life
Without Possibility of Parole.   The sentence overturned by the
court of appeals he was given a term of Life."   (<u>Id.</u> Ex. I ¶
I.A.)   Petitioner has also represented in his First Amended
Petition, and the state Superior Court also appears to have been
of the understanding, that petitioner's first sentence was
reduced to twenty-five years to life.   (<u>Id.</u> at 4:3-4, Ex. L at
2.)

are citations for conduct that "is believed to be a violation of law or is not minor in nature."  Cal. Code Regs. tit. 15, § 3312(a)(3).  Petitioner received Form 115 citations on (1) September 9, 1979, for an altercation; (2) October 26, 1979, for possession of a weapon; (3) June 5, 1980, for possession of alcohol; (4) June 23, 1980, for force and violence; (5) July 25, 1980, for possession of pruno; (6) February 1, 1982, for force and violence and stabbing assault; (7) September 6, 1982, for an altercation; (8) November 9, 1982, for possession of alcohol; (9) February 23, 1983, for threatening staff (spitting and threats); (10) July 21, 1983, for possession of pruno; (11) September 18, 1983, for disobeying a direct order; (12) October 12, 1983, for force and violence; (13) November 9, 1983, for destruction of state property; (14) December 9, 1983, for self-mutilation; (15) April 7, 1984, for force and violence (stabbing assault); (16) April 20, 1985, for assault on an inmate; (17) June 29, 1985, for destruction of state property; (18) May 2, 1986, for self-mutilation; (19) January 9, 1988, for possession of marijuana; (20) January 9, 1988, for threatening staff; (21) February 28, 1989, for threatening staff / possession / being under the influence of pruno; (22) June 12, 1992, for manufacturing alcohol; and (23) April 11, 1993, for stimulants and sedatives (alcohol).  (First Am. Pet. Ex. C at 1.)

        When rendering its decision, the parole board unequivocally identified petitioner's behavior in prison as one of the considerations leading to its decision that he was not suitable for parole:

        And then, in your case, we believe that because of the

13

enormity of the crimes <u>and because of the period of your institutional behavior</u>, that additional time is needed. And in a separate decision, we conclude that for those same factors relating to the enormity of the crime <u>and the period of disciplinary conduct</u>, we believe a three-year period is necessary . . . .

(<u>Id.</u> Ex. A at 93:12-20 (emphasis added); <u>see also</u> <u>id.</u> Ex. A at 92:20-25 ("Upon your entry into the institution, it took awhile for things to turn around.  The (indiscernible) incarceration history was complete with numerous disciplinary actions, counted 21 115's in total, your last one being in April 1992.").)

        As the parole board continued its explanation, petitioner's attorney inquired and confirmed that petitioner's post-conviction behavior was one of the considerations supporting its decision:

        **PRESIDING COMMISSIONER FARMER:** . . . You and your Attorney have worked to prepare a presentation to demonstrate that you have changed and you have done many good things to indicate that is true, but you also have an egregious period or egregious misconduct.  And in order for us to recommend to the parole board, and to the Governor, and to the society at large, that you are in fact what you say, we need to have an extensive period of time of demonstration of that behavior.
        **ATTORNEY MUSGROVE:** Is that -- I'm sorry for interrupting, Mr. Farmer, but is that egregious conduct, is that based on the crime or is that based on post-conviction conduct, the 115's?
        **PRESIDING COMMISSIONER FARMER**: Post-conviction conduct to the time of the transformation.
        **ATTORNEY MUSGROVE:** Okay.
        **PRESIDING COMMISSIONER FARMER**: His history is those crimes.  It is also his initial conduct within the institution.
        **ATTORNEY MUSGROVE:** I understand.  They are both being considered.
        **PRESIDING COMMISSIONER FARMER**: Yes, they are.

(<u>Id.</u> Ex. A at 94:19-95:18.)

        In contrast to the twenty-three Form 115 citations petitioner incurred during fourteen of the twenty-six years he

                                    14

had served as of his 2005 hearing, the petitioners in <u>Biggs</u>, <u>Sass</u>, and <u>Irons II</u> had nearly perfect behavior in prison.   The Ninth Circuit described Biggs, who had "received his sole disciplinary violation for failing to follow instructions," as a "model inmate."  <u>Biggs</u>, 334 F.3d at 912.  Sass was described as possessing "an essentially unblemished record of conduct in prison" and had received "only two minor disciplinary notices," one for speaking too loud on the phone and the other for participating in a work stoppage.  <u>Sass</u>, 461 F.3d at 1130, 1130 n.2 (Reinhardt, J., dissenting).  Irons's behavior in prison was similar: "Throughout his confinement, [Irons's] conduct has been exemplary.  From 1988 to the present he has maintained 'Medium A' custody status, indicating that prison officials see him as a low threat.  He has not engaged in further acts of violence, nor has he received any C.D.C. 128A written disciplinary charges."  <u>Irons II</u>, 505 F.3d at 849.

As previously discussed, the Ninth Circuit's "warning" in <u>Biggs</u>, <u>Sass</u>, and <u>Irons II</u> is expressly limited to denials of parole based solely on a petitioner's commitment offense:

> We hope that the Board will come to recognize that in some cases, indefinite detention <u>based solely on an inmate's commitment offense</u>, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes.

<u>Id.</u> at 854 (citing <u>Biggs</u>, 334 F.3d at 917) (emphasis added).  In this case, the parole board's decision that petitioner was not suitable for parole thus does not come within the due process concerns the Ninth Circuit warned against in <u>Biggs</u>, <u>Sass</u>, and <u>Irons II</u> because the parole board did not rely exclusively on

15

1  petitioner's commitment offenses.

2        With the Ninth Circuit's dicta in <u>Biggs</u>, <u>Sass</u>, and
3  <u>Irons II</u> in mind, there may be a point at which the parole
4  board's continued reliance on petitioner's Form 115 citations
5  from 1979 to 1993 to deny his parole may give rise to a due
6  process violation because, like his commitment offenses, his
7  conduct during that period is "immutable behavioral evidence."
8  It has not, however, reached that point.  Petitioner's record of
9  citations illustrates a consistent pattern of violent and
10  antisocial conduct for more than half of the time he was
11  incarcerated.  Although petitioner appears to have improved his
12  conduct and was disciplinary free for the twelve years of
13  incarceration before his hearing, the nature of petitioner's
14  commitment offenses, his conduct before incarceration, and the
15  fourteen years of consistently troubled behavior in prison serve
16  as "some evidence" supporting the conclusion that twelve years
17  after fourteen years of bad behavior and petitioner's commitment
18  offenses is simply not enough to find that he no longer presents
19  a threat to society.

20        With the exception of <u>Hayward v. Marshall</u>, 512 F.3d 536
21  (9th Cir. 2008), which is no longer citable precedent because the
22  Ninth Circuit decided to rehear the case <u>en banc</u>, the Ninth
23  Circuit has yet to rely on <u>Biggs</u>, <u>Sass</u>, and <u>Irons II</u> to conclude
24  that exclusive reliance on immutable pre-conviction
25  considerations did not constitute "some evidence" supporting the
26  denial of parole.  While this court does not question that an
27  inmate with exemplary prison behavior and unequivocal indicators
28  of rehabilitation may successfully rely on <u>Biggs</u>, <u>Sass</u>, and <u>Irons</u>

16

1    II, petitioner's circumstances do not invoke such due process

2    concerns.   The evidence shows that petitioner committed two

3    extremely brutal murders and attempted to commit a third murder

4    while in custody.   Once in prison, he continued to demonstrate

5    violent behavior and a lack of rehabilitation for fourteen years.

6    While the twelve years proceeding petitioner's 2005 parole

7    hearing give some suggestion that his behavior has improved with

8    age, it is not sufficient to vitiate the pattern of behavior he

9    demonstrated for fifteen years.   Accordingly, the court will deny

10   petitioner's writ because the state court was not unreasonable in

11   concluding that "some evidence" supports the parole board's

12   decision.

13         D.   Appropriate Remedy

14              Notwithstanding the fact that the state court

15   reasonably concluded that "some evidence" supports the parole

16   board's decision, the court notes that, even if it concluded

17   otherwise, ordering petitioner released forthwith would not be

18   the appropriate remedy in this case.   Paroling an inmate serving

19   an indeterminate sentence in California involves two distinct

20   steps.   First, the parole board must determine whether the inmate

21   is suitable for parole.   See Cal. Code Regs. tit. 15, § 2402(a)

22   ("The panel shall first determine whether the life prisoner is

23   suitable for release on parole."); see also Cal. Penal Code §

24   3041(b) ("The panel or the board, sitting en banc, shall set a

25   release date unless it determines . . . the public safety

26   requires a more lengthy period of incarceration for this

27   individual, and that a parole date, therefore, cannot be fixed at

28   this meeting."); In re Dannenberg, 34 Cal. 4th at 1079-80.   If

                                   17

the parole board determines that an inmate is not suitable for parole, the parole board's inquiry ends until the inmate's next parole hearing.

If, however, the parole board determines the inmate is suitable for parole, then the parole board must set a release date "in a manner that will provide uniform terms for offenses of similar gravity and magnitude with respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Penal Code § 3041(a). Under the parole board's regulations, the parole board uses a bi-axial matrix to calculate a release date so that the date ensures sentencing uniformity among similar crimes and accounts for aggravating and mitigating circumstances. In re Dannenberg, 34 Cal. 4th at 1079.

When the parole board finds that an inmate is not suitable for parole, it does not address the appropriate release date for the inmate and the mandatory considerations from the second step are thus not evaluated. Id. at 1080. Ordering petitioner released forthwith without remanding to the parole board for a determination of the appropriate release date would therefore circumvent California's effort to ensure sentencing uniformity. See Sass, 461 F.3d at 1132 (Reinhardt, J., dissenting on other grounds). Thus, when reviewing a parole board's finding that an inmate is not suitable for parole, "a writ would simply require that the Board set a parole date for him pursuant to the procedures set forth in its regulations." Id. at 1132 (Reinhardt, J., dissenting on other grounds); cf.

McQuillion v. Duncan, 342 F.3d 1012, 1014-15 (9th Cir. 2003) (affirming district court's immediate release of petitioner when the parole board had previously set a release date that had since passed and the court found that "some evidence" did not support the parole board's subsequent decision to rescind the release date).

Furthermore, under California's parole scheme, once a parole board has determined that a prisoner is suitable for parole and sets a parole date, "the parole date of a life . . . prisoner may be postponed or rescinded for good cause at a rescission hearing." Cal. Code Regs. tit. 15, § 2450. The regulations further provide that "Department staff shall report to the Board at the central office calendar conduct which may result in rescission proceedings" and, upon receipt of such information, the "Board shall determine whether to initiate rescission proceedings." Id. § 2451.

As examples of conduct that "must be reported to the Board," section 2451 identifies "Disciplinary Conduct," including "conduct which seriously disrupts institutional routine, or which strongly indicates that the prisoner is not ready for release . . . ." Id. § 2451(a)(13). Section 2451 also identifies mandatory reporting for "[a]ny prisoner whose mental state deteriorates to the point that there is a substantial likelihood that the prisoner would pose a danger to himself or others when released." Id. § 2451(b).

Here, respondent has submitted petitioner's November 2008 Psychological Evaluation, which raises several issues that prison staff would likely have been required to report to the

19

parole board and could have resulted in the parole board setting a recession hearing if petitioner had been granted parole in 2005.  The evaluation indicates that petitioner has received two Form 115 citations since his 2005 hearing.  (Resp't's Objections Ex. A at 4.)  The first was issued on January 5, 2007 for disrespecting staff, but was administratively reduced to a Form 128-A citation, the disciplinary citation for "minor misconduct." (<u>Id.</u>); Cal. Code Regs. tit. 15, § 3312(a)(2).  The second was issued on January 10, 2008 for "Refusing to Work."  (Resp't's Objections Ex. A at 4.)

        The evaluation also indicates that petitioner's continued participation in AA and NA was recommended by the examining psychologist in 2005, but that petitioner had since reduced his attendance in "AA or NA self-help activities without any reported replacement to help him avoid a return to substances in the face of future pressures."  (<u>Id.</u> Ex. A at 12-13.)  It further notes that petitioner "apparently self-referred" himself to Mental Health Services on June 28, 2006, resulting in the following note: "I'm having trouble with my time.  I've been down 28 years and I have 3 life sentences.  Ya [sic] I go to the board, but that is depressing.  I accidentally OD on heroin about 10 days ago -- no it's not a suicide attempt -- no I don't want CCCMS."  (<u>Id.</u> Ex. A at 3.)  Although the note is not entirely clear and the examining psychologist indicated he discovered the note after his exam and therefore did not discuss it with petitioner, the note raises the possibility that petitioner used heroin on at least one occasion since his 2005 hearing.  (<u>Id.</u>)

        Lastly, the evaluation concludes that petitioner

"represents a **moderate to high** risk of future general recidivism, including potential violence," which is an increase from the finding during his exams in 2005 that he represented a low and a low to moderate risk of recidivism. (<u>Id.</u> Ex. A at 15; First Am. Pet. Ex. B at 5, Ex. K at 10.)

Releasing petitioner despite evidence that he may present a current risk to the public directly conflicts with the purpose of California's parole scheme. <u>See</u> <u>In re Lawrence</u>, 44 Cal. at 1205-06. Therefore, even if the state court was unreasonable in finding that the parole board's decision satisfied the "some evidence" standard, the parole board should also have the opportunity to determine whether petitioner's entitlement to parole would have, in essence, been rescinded based on his conduct after the 2005 hearing.

IT IS THEREFORE ORDERED the Magistrate Judge's Findings and Recommendations filed March 5, 2010 are rejected, and petitioner's petition for a writ of habeas corpus is hereby DENIED.

DATED:  April 12, 2010

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE